## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 16 2019, 6:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kyle D. Gobel
Crawfordsville, Indiana

ATTORNEY FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:

B.H. (Minor Child)

and

A.H. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

January 16, 2019

Court of Appeals Case No. 18A-JT-1870

Appeal from the Montgomery Circuit Court

The Honorable Harry Siamas, Judge

Trial Court Cause No. 54C01-1705-JT-131

**Tavitas, Judge.**

## Case Summary

[1] A.H. ("Mother") appeals the trial court's termination of her parental rights to B.H. (the "Child"). We affirm.

## Issue

[2] Mother raises two issues, which we consolidate and restate as whether the evidence is sufficient to support the termination of Mother's parental rights.

## Facts

[3] On November 13, 2015, the Child was born to Mother and E.G. ("Father"). Mother has an older child, and maternal grandmother has a guardianship over that child. The Child was born "drug positive and was going through withdrawals" at the hospital. Tr. Vol. II p. 11. Mother admitted that she had been addicted to heroin and methamphetamine in the past and that she used methadone during her pregnancy. Father was incarcerated at the time of the Child's birth.[1]

[4] The Montgomery County Office of the Department of Child Services ("DCS") filed a petition alleging that the Child was a child in need of services ("CHINS") under Indiana Code Section 31-34-1-1 and Indiana Code Section 31-34-1-10 because: (1) the Child was exhibiting "symptoms of opiate

---

[1] Father does not appeal the termination of his parental rights to the Child. Consequently, we have not included additional facts relevant to Father.

withdrawal;" (2) Mother told her doctor in April 2015 that she wanted to stop using heroin; (3) Mother was prescribed methadone in May 2015; (4) Mother was involved in an automobile accident in August 2015 and tested positive for Vicodin; and (5) Father was incarcerated. Ex. p. 14. Mother admitted that the Child was a CHINS. The Child was placed with Mother, who was living with grandmother, as "an in home CHINS." *Id.* at 53-54. In the dispositional order, the trial court ordered that Mother participate in individual therapy, home-based case management, a substance abuse assessment and any recommended treatment, and random drug screens.

On January 25, 2016, Mother and the Child were dropped off by two unidentified men at a hospital in Lafayette. Mother was in respiratory arrest and was blue. Narcan was administered, and Mother later admitted to using heroin. Mother admitted that she allowed a male friend to drive with the Child in the vehicle after Mother and the man used heroin. Mother tested positive for heroin, amphetamines, and benzodiazepines. DCS filed a request to take custody of the Child, which the trial court granted. The Child was subsequently placed in foster care. The Child was later placed with a relative. The relative contacted DCS and requested the Child's removal, and the Child was returned to his foster care placement, where he has remained.

Mother failed to regularly attend substance abuse counseling. In March and April 2016, Mother tested positive for methamphetamine, amphetamine, and tramadol. Mother agreed to participate in in-patient services and was referred to an "inpatient detoxification treatment." Ex. p. 80. Mother completed the

"detox program and 2 week inpatient treatment program." *Id.* at 111. Subsequently, she attended an intensive outpatient program but later relapsed. During July and September 2016, Mother tested positive for heroin, morphine, buprenorphine, methadone, and tramadol. Mother also routinely avoided submitting to drug screens.

[7] During the CHINS proceedings, Mother moved multiple times. In the fall of 2016, Mother moved into Half Way Home, where she lived for a few weeks. She was discharged because she used heroin. Mother subsequently lived in Indianapolis with a friend and later at a shelter in Indianapolis. Mother and Father lived in several places in Crawfordsville and with maternal grandmother.

[8] Mother completed a substance abuse assessment in October 2016. At that time, Mother reported that she had abused heroin daily and that she had four prior failed attempts at treatment. Mother was recommended for participation in an intensive outpatient program followed by a relapse prevention program. Mother completed the intensive outpatient program; however, she failed to complete the relapse prevention program. Mother also attended only two individual therapy sessions and failed to attend a medication evaluation session.

[9] DCS filed a petition for termination of Mother's parental rights in May 2017. In May 2017, Mother tested positive for alcohol, and in June 2017, Mother tested positive for alcohol and tramadol. Additionally, Mother was arrested in July 2017 for unlawful possession of a syringe, a Level 5 felony, and possession of paraphernalia, a Class C misdemeanor, and she remained incarcerated until

November 2017. In November 2017, Mother pleaded guilty to unlawful possession of a syringe, a Level 5 felony. The trial court sentenced Mother to three years in the Department of Correction, which was suspended, and she was placed on probation.

[10] As a term of probation, Mother was ordered to successfully complete the drug court program. The drug court program is a two- to three-year program. As part of the program, Mother would (1) receive substance use disorder counseling and individual mental health counseling; (2) meet with the judge weekly; (3) participate in a twelve-step program, which includes ninety meetings in ninety days; (4) meet with a mental health counselor once a week; (5) participate in two weekly meetings with her probation case manager; (6) meet with a skill building counselor once per week; and (7) take drug screens once or twice per week.

[11] The Child has a "seizure disorder and global delay," which is a significant developmental delay. Tr. Vol. II p. 89. The Child started having seizures when he was approximately six months old. The Child has two types of seizures: (1) absent seizures in which the Child glazes over and stares; and (2) life-threatening grand mal seizures in which the Child has convulsions and he stiffens and holds his breath. If the Child experienced a seizure, his foster parents were instructed to turn him on his side and time the seizures. If the seizure lasted longer than five minutes, they were to administer a rescue medicine and call the hospital. If they could not stop the seizure, foster parents were instructed to take the Child to the emergency room. The Child was

repeatedly hospitalized due to his seizures. After a severe seizure, the doctors would "load him with medicines," and the Child could "barely walk" for approximately three days. *Id.* at 147. Foster parents recounted that the Child's "whole personality changes," and he bites, pinches, and hits after a seizure. *Id.*

[12] Accordingly, the Child required twenty-four-hour-a-day supervision from his foster family. "[M]issing the medication, being overly tired, not having a schedule, stress, [or] emotional distress" could trigger a seizure in the Child. *Id.* at 163-64. The Child participated in speech therapy, developmental therapy, occupational therapy, and physical therapy. Furthermore, the foster mother spent two to three hours per day working on various therapies with the Child. The Child experienced significant delays in cognitive and developmental function and is likely to be "learning disabled." *Id.* at 124. Although the Child was making substantial progress with his therapies, he has significant developmental setbacks with each major seizure. If foster mother needed a "break" from the Child, the foster family found a retired nurse that can care for the Child, continue the Child's therapies, and monitor the Child for seizure activity. *Id.* at 152-53.

[13] At the time of the termination hearings, Mother had been participating in the drug court program for six months. Mother appeared to be doing well, was passing drug screens, was maintaining employment, and was living at Pam's Promise. Mother was attending five NA or AA meetings per week along with meeting the other drug court requirements. According to Mother, she had been

"clean" for ten months. *Id.* at 109. Mother, however, had not seen the Child since July 2017 when she was arrested.

The trial court entered findings of fact and conclusions of law granting DCS's petition to terminate Mother's and Father's parental rights. Mother now appeals.

## Analysis

Mother challenges the termination of her parental relationship with the Child. The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re C.G.,* 954 N.E.2d 910, 923 (Ind.

2011).  We consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*  We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses.  *Id.* (quoting Ind. Trial Rule 52(A)).

[17]  Pursuant to Indiana Code Section 31-35-2-8(c), "[t]he trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[2]  Here, the trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Mother's parental rights.  When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review.  First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment.  *Id.*  We will set aside the trial court's judgment only if it is clearly erroneous.  *Id.*  A judgment is clearly erroneous if the

---

[2] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

    (a)  Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

    (b)  If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[18] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

    (A)    That one (1) of the following is true:

        (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

        (ii)    The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

        (iii)    The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services of a delinquent child.

    (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

[19] Mother makes two arguments on appeal. First, Mother argues that the trial court's conclusion that the conditions that led to the Child's removal would not be remedied is clearly erroneous. Next, Mother argues the trial court's conclusion that termination of Mother's rights is in the best interests of the Child is clearly erroneous.

### A. Probability that Removal Conditions will not be Remedied

[20] We first address the trial court's finding regarding whether there is a reasonable probability that the conditions that resulted in the Child's removal or the

reasons for placement outside the home of the parents will not be remedied. "In determining whether 'the conditions that resulted in the [Child's] removal . . . will not be remedied,' we 'engage in a two-step analysis.'" *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "First, we identify the conditions that led to removal; and second, we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* In analyzing this second step, the trial court judges the parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.* (quoting *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 152 (Ind. 2005)). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[21] On this issue, the trial court found:

> The DCS has proven by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied. The DCS has offered reunification services to both parents but neither parent was able to participate in these services in order to overcome their parenting deficits and eventually reunification services were terminated for noncompliance. While mother has made very positive progress in the Drug Court Program and for this she should be commended, it is too late. The child has been removed

from her care for over two years. She has had no contact with the child since July 2017. This was caused by her drug addiction and her failure to stay sober after several attempts at treatment for her addiction. The child has been dependent on his foster parents during this period for the heightened level of parental nurturing and care that he requires. Mother and father have not had to care for the needs of this medically and developmentally challenged child. As a result of the parent's absence in the child's life resulting from their involvement in illegal drugs and criminal activity the child is bonded to his foster parents who have provided him with the care and nurturing that a child his age needs.

Appellant's App. Vol. II pp. 15-16.

[22] We first address Mother's contention that the trial court held against her the fact that the trial court denied her request to resume visitations with the Child. It is undisputed that Mother has not seen the Child since July 2017 when she was arrested. In February 2018, the trial court noted the following in a periodic case review:

> The mother requests the Court to order DCS to restart reunification services. The Court denies mother's request; the Court believes the mother is doing services through her probation and does not need the DCS services. The Court denies mother's request for visits at this time pending the TPR outcome in the best interests of the child. The Court though will not hold the 90 days pending the TPR hearing against the mother (relative to not visiting with the child).

Ex. p. 151. Mother contends that, despite the trial court's assurance, it held the fact that she had not seen the Child against her. In its findings of fact and

conclusions of law regarding the termination of Mother's parental rights, the trial court noted that Mother had "no contact with the child since July 2017" due to "her drug addiction and her failure to stay sober after several attempts at treatment for her addiction." Appellant's App. Vol. II p. 15. To the extent that the trial court stated that it would not hold the ninety days between the February 2018 order and the termination hearing against Mother and then held the lack of contact against her, we conclude that this finding is erroneous. The error, however, is harmless. The fact remains that Mother did not see the Child between July 2017 and February 2018 due to her significant drug addiction and incarceration.

[23] Mother next argues the trial court's conclusion is clearly erroneous because, in the months leading up to the termination hearing, she "accomplished a complete turnaround."[3] Appellant's Br. p. 17. According to Mother, she was "quite obviously in a better position to care for and provide a home for the Child th[a]n she was at the beginning of the CHINS case." *Id.* at 19.

[24] The Child was removed from Mother due to Mother's significant drug addiction. Mother's addiction has been ongoing since at least 2010. *See* Tr. Vol. II p. 47 (discussing Mother's intensive outpatient treatment in 2010). The

---

[3] Mother also challenges the trial court's finding that "Mother currently is not in a better position to provide the child with appropriate care, supervision or a safe, nurturing and stable home than she was at the beginning of DCS' involvement with the family." Appellant's App. Vol. II p. 16. This finding, however, was made in connection with a determination of the Child's best interests. Consequently, we address this finding in the context of the Child's best interests.

Child was born in November 2015 exhibiting signs of opiate withdrawal. Although the Child was initially placed with Mother as an in-home CHINS, just a few weeks later, Mother and the Child were dropped off at the hospital while Mother was overdosing on heroin. Mother admitted that she allowed a male friend to drive with the Child in the vehicle after both Mother and the man used heroin. During the CHINS proceedings, Mother was offered many drug treatment options, but she relapsed many times. Mother repeatedly failed drug screens and failed to submit to the drug screens.

[25] We applaud Mother for her recent progress in overcoming her addictions through the drug court program. We cannot say, though, that the trial court's conclusion is clearly erroneous given Mother's past conduct. Mother has a long history of drug addiction, and Mother was given many opportunities during the CHINS proceeding to address her significant addiction issues. Mother, however, made no progress until she was threatened with incarceration and sentenced to participate in the drug court program as a condition of her probation.

[26] Mother only completed six months of a drug court program that requires an intensive commitment for two to three years. At the time of the termination hearing, Mother had been "clean" for ten months. Tr. Vol. II p. 109. Mother, however, testified that she had last been "sober and clean for a period of ten months" in 2014 while she was at Home With Hope. *Id.* Consequently, the fact that Mother has been "clean" for ten months in the drug court program does not indicate that Mother's battle with substance abuse has been won.

[27] We also note that, as part of the drug court program, Mother (1) receives substance use disorder counseling and individual mental health counseling; (2) meets with the judge weekly; (3) participates in a twelve-step program, which included ninety meetings in ninety days; (4) meets with mental health counselor once a week; (5) participates in twice weekly meetings with her probation case manager; (6) meets with a skill building counselor once a week; and (7) submits to drug screens once or twice a week. Additionally, Mother is required to maintain employment and housing. Given the extensive drug court program requirements, Mother is not prepared to take care of the Child, who requires twenty-four-hour-a-day care due to his seizure disorder and developmental delays. Mother, who does not even have custody of her older child, is not equipped to simultaneously complete her drug court requirements, maintain sobriety, and care for the Child.

[28] Given Mother's long-term significant history of substance abuse and the Child's special needs, the trial court's conclusion regarding a reasonable probability that the conditions resulting in the Child's removal will not be remedied is not clearly erroneous despite recent improvements in Mother's circumstances.

### B. Child's Best Interests

[29] Mother next challenges the trial court's determination that termination is in the best interests of the Child. In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *See In re A.B.,* 887 N.E.2d 158, 167-68 (Ind. Ct. App. 2008). In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.*

at 168. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *K.T.K.*, 989 N.E.2d at 1235. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

[30]     Regarding the Child's best interests, the trial court concluded:

> The DCS has proven by clear and convincing evidence that termination is in the best interests of child. Mother currently is not in a better position to provide the child with appropriate care, supervision or a safe, nurturing and stable home than she was at the beginning of DCS' involvement with the family. Mother is unable currently to meet the child's special needs. The child needs twenty-four hour supervision with several hours spent each day in play therapy in order to address the child's developmental delays. Mother has not provided the child with the intensive care and nurturing that he needs. Mother will be in the Drug Court Program for another one and half to two years. This program requires mother to spend much of her free time meeting with her probation officer, her therapist, the judge, and with the requirements of her twelve-step program. The child needs a stable and nurturing home to meet the child's needs. The CASA and DCS case manager believe that termination is in the best interest of the child.

Appellant's App. Vol. II p. 16.

[31]     Mother argues that, at the time of the termination hearing, she was "a fit and proper parent to care for the Child, regardless of the Child's special needs."

Appellant's Br. p. 20. Mother emphasizes that she has been sober, stable, and has complied with the drug court services. Finally, Mother challenges the trial court's finding that "Mother currently is not in a better position to provide the child with appropriate care, supervision or a safe, nurturing and stable home than she was at the beginning of DCS' involvement with the family." Appellant's App. Vol. II p. 16.

[32] As noted, Mother still has an intensive commitment to the drug court program to complete. The Child has significant special needs and requires twenty-four-hour-a-day care. Mother testified that she was aware of the Child's medical issues and developmental delays. When asked if she was "equipped to deal with those" issues, she said that she could be if she received training or classes on seizures and that she was "willing to do whatever [she] need[ed] to do basically to be equipped to deal with those things." Tr. Vol. II p. 111.

[33] The DCS family case manager, however, testified that the Child "needs a lot of individual care and . . . he needs somebody who is going to be there all the time for him and . . . as much as I hope [for Mother's] success I just don't think that she's going to be able to give him the care that he needs right now, not a year and a half down the road, but right now this is the time." *Id.* at 124. The family case manager believed that Mother was "nowhere near ready to take this child" and that the Child needed permanency. *Id.* at 134. Both the family case manager and the court-appointed special advocate testified that termination of Mother's parental rights was in the Child's best interests.

Although Mother has made progress in addressing her addictions, she still has a long road ahead of her. The Child needs permanency and stability that Mother simply is not able to provide at this time. The trial court's conclusion that termination of Mother's parental rights is in the Child's best interests is not clearly erroneous.

# Conclusion

The trial court's termination of Mother's parental rights is not clearly erroneous. We affirm.

Affirmed.

Baker, J., and May, J., concur.